COMMONWEALTH vs. DANIEL J. BURKE
(and a companion case[1]).

Essex.  February 13, 1985. — August 6, 1985.

Present: SMITH, CUTTER, & FINE, JJ.

*Conspiracy. Conflict of Interest. Hypnosis. Evidence*, Admissions and confessions, Hypnotically aided testimony. *Grand Jury. Practice, Criminal*, Severance, Disclosure of evidence, Reopening of evidence, Argument by prosecutor, Affidavit, Instructions to jury.

Discussion of the law of the Commonwealth as it relates to the admission at a criminal trial of the testimony of a witness who has undergone hypnosis. [499-500]

With respect to a prosecution witness at a criminal trial who had undergone hypnosis prior to the date of the Supreme Judicial Court's opinion in *Commonwealth* v. *Kater*, 388 Mass. 519 (1983), the Commonwealth had the burden of showing either that the witness's testimony was uninfluenced by hypnosis or that his testimony was based solely on his prehypnotic memory. [500-501]

Testimony at a criminal trial by a prosecution witness who had undergone hypnosis was "reliable" in the sense in which that word was used in *Commonwealth* v. *Kater*, 388 Mass. 519, 524 (1983), and *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 734 (1981), where the record showed the witness's trial testimony to have been based almost entirely on his prehypnotic memory, and where any of his testimony resulting from hypnosis either dealt with undisputed matters or was adequately corroborated. [501-503]

The record of a criminal trial, during which testimony had been received from a prosecution witness who had undergone hypnosis, revealed no such alteration of the witness's memory or demeanor resulting from the hypnosis as would abridge the defendants' constitutional right to confront him. [503]

On motions to dismiss indictments against them, the defendants in a criminal case did not properly raise their contention that the procedures employed in selecting the grand jury had resulted in systematic exclusion of black and Hispanic persons, where the forms of affidavit accompanying the motions were not signed, and thus did not comply with Mass.R.Crim.P. 13 (a) (2), 378 Mass. 871 (1979). [503-505]

[1] Commonwealth *vs.* Paul C. Gaudet.

Evidence at the conspiracy trial of two defendants warranted the judge in denying the motion of one of them for a required finding of not guilty, where the evidence tended to prove that the moving party, while employed as an assistant county dog officer, actively participated in a conspiracy in which he and his codefendant, a county commissioner, would solicit and receive money in the guise of campaign contributions in return for the codefendant's being influenced in the award of construction management contracts for certain public works projects contemplated by the county. [505-507]

At the trial of indictments charging two county employees with conspiracy to violate G. L. c. 268A, §§ 2 (*b*) and 3 (*b*), the judge's instructions to the jury concerning the law of conspiracy and the law relating to the substantive offenses, taken as a whole, were clear and correct. [507-508]

At the trial of indictments charging conspiracy to violate provisions of the Conflict of Interest Law, there was no error in the judge's instructing the jury that the conduct described in G. L. c. 268A, § 3 (*b*), is a lesser included offense within that described in § 2 (*b*) of that chapter, and in dismissing a count that charged violations of § 3 (*b*) as a separate offense. [509]

INDICTMENTS found and returned in the Superior Court Department on January 27, 1981.

The cases were tried before *Rudolph F. Pierce,* J.

*Daniel E. Callahan,* Committee for Public Counsel Services, for Paul C. Gaudet.

*Earle C. Cooley* (*Thomas G. Guiney* with him) for Daniel J. Burke.

*Dyanne Klein Polatin,* Assistant District Attorney (*Robert N. Weiner,* Assistant District Attorney, with her) for the Commonwealth.

SMITH, J. On January 27, 1981, an Essex County grand jury returned indictments containing three counts against each of the defendants, Daniel J. Burke and Paul C. Gaudet. Count one in each indictment alleged that between July 1, 1973, and January 28, 1975, each defendant, along with the other defendant and with Daniel J. Shields, William F. Harding, Jerry J. Campana, and Adek Apfelbaum,[2]

---

[2] Campana was also indicted for the same crimes, tried with Burke and Gaudet, and was acquitted. Harding was also indicted, but was living in Saudi Arabia at the time of indictments and was not amenable to legal process. Shields and Apfelbaum were unindicted coconspirators.

had conspired to violate G. L. c. 268A, § 2(*b*), as amended by St. 1964, c. 287.[3] Count two alleged the same conspiracy but without corrupt intent. See G. L. c. 268A, § 3(*b*). Count three alleged a conspiracy to violate G. L. c. 268A, § 4.[4] Burke was convicted of conspiracy to violate G. L. c. 268A, § 2(*b*) (corrupt intent), and Gaudet was found guilty of conspiracy to violate G. L. c. 268A, § 3(*b*) (without corrupt intent).[5] On these appeals, the defendants allege several errors which they claim require reversal of their convictions. We consider the defendants' principal allegations of error in the opinion and briefly discuss, in the appendix, several other claims of error.

[3] General Laws c. 268A, § 2(*b*), states:

"(b) Whoever, being a state, county or municipal employee or a member of the judiciary or a person selected to be such an employee or member of the judiciary, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for

(1) being influenced in his performance of any official act or any act within his official responsibility, or

(2) being influenced to commit or aid in committing, or to collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the commonwealth or on a state, county or municipal agency, or

(3) being induced to do or omit to do any acts in violation of his official duty . . . ."

[4] The judge dismissed counts two and three at the conclusion of all evidence but did not charge the jury on conspiracy to violate G. L. c. 268A, § 3(*b*), as a lesser included offense of count one. See n.30, *infra*.

[5] The defendants were convicted in November, 1981, and their appeals were not argued in this court until February, 1985. There are several reasons for the inordinate delay. There were a number of pretrial hearings concerning the defendants' motions, at which evidence was taken. At least seven different court reporters were involved in those hearings. After the defendants were convicted, the judge's actions on the motions were appealed, and the transcripts had to be prepared. Their preparation caused considerable delay. In addition to those transcripts, thirteen volumes of trial transcript had to be prepared. The defendants changed counsel during the course of their appeals, which also caused delay. New appellate counsel made several reasonable requests for further time to familiarize themselves with the trial proceedings and to write their briefs. Because of the complex nature of the cases, all sides were given permission to file briefs in excess of the usual limit. We note that everyone took generous advantage of that permission. We view the delay with some concern. We hope that recent technological advances in the prepartion of transcripts will be made available to court reporters and thus speed up the appellate process.

It was the Commonwealth's theory at trial that Burke, while an Essex County commissioner, and Gaudet, an assistant county dog officer, entered into a conspiracy with the other persons named in the indictments. The purpose of the conspiracy was for Burke and Gaudet to solicit and receive money the guise of campaign contributions in return for Burke's being influenced in an official act, i.e., the award to Project Construction Management, Inc. (PCM), of construction management contracts for certain projects contemplated by Essex County. Gaudet's role in the conspiracy was to act as an agent of Burke. We summarize the facts, leaving some details to be described when we discuss the various issues raised by either or both of the defendants. In reading the summary of facts it is important to keep in mind that February 5, 1974, was the date that the county commissioners first voted to award the construction management contracts to PCM and that prior to that meeting, neither of the other two commissioners had ever heard of the company.

The chief prosecution witness was Daniel Shields. He first met Burke and Gaudet either in 1969 or 1970. Gaudet was a close associate and political supporter of Burke. His wife, Barbara, was the treasurer of the Burke campaign committee. At the time that Shields met them, Burke was a county commissioner in Essex County, and Gaudet was employed as the assistant dog officer for that county.[6] Shields was introduced to the defendants by Harding. Shields, at the time, was the president of Mauchly Construction Management (Mauchly), a firm that specialized in providing management services to clients in regard to construction projects. Harding also worked for Mauchly at the time, in sales, and his territory included Essex County.

---

[6] The position of assistant dog officer for the county was created by the county commissioners on January 27, 1969, on motion of Burke. On the same date, Gaudet was appointed to that position by the county commissioners, again on motion of Burke. On September 18, 1974, the office of assistant dog officer was abolished. Gaudet was appointed administrative assistant to the county commissioners on the same date on motion of Burke.

In 1971 Mauchly merged with McKee-Berger-Mansueto, Inc. (MBM), a firm also engaged in the construction management field. Both Shields and Harding were employed by MBM in sales. Later, Shields became president of MBM. While working for MBM, Shields became friendly with two other persons named in the indictments, Campana and Apfelbaum, both of whom were employed for a time by MBM. While employed by MBM, Shields and Harding kept up their acquaintanceship with Burke and Gaudet.

In July, 1973, Shields left MBM. Apfelbaum had also left the company and had formed a construction management firm, called Slaydek, with one Slayton. Some time between August and October of 1973, Apfelbaum asked Shields to join Slaydek. Shields decided instead to start PCM with Campana. The company would be affiliated with Slaydek. PCM would be involved in sales, and Slaydek would handle the technical side of construction management. While PCM was in the process of being formed, Harding informed Shields that he had heard from Burke that Essex County planned to have some construction work done.[7] Harding told Shields that Burke had informed him that he (Burke) had "reservations" about utilizing the services of MBM for construction management of the projects and that he (Burke) wanted Harding to handle the scheduling of the construction projects because of his confidence in Harding's ability.[8] In early November, 1973, Shields, Harding, Campana,

---

[7] There was also evidence that Harding had heard from Gaudet about the planned construction work by the county. A letter from Gaudet to Harding, dated October 26, 1973, was introduced in evidence. The letter was written on the county commissioners' stationery and notified Harding that he had been selected by the Essex County building committee to enter into contract negotiations for two new courthouses and a new jail. Gaudet signed the letter as "Construction Director." His position in the county at that time was assistant dog officer. A copy of the letter was not to be found in the county commissioners' office.

[8] There was evidence that the reason that Burke had "reservations" about hiring MBM was because of its handling of the construction project at University of Massachusetts at Columbia Point. Shields also testified that Harding told him that he had informed Burke that he (Harding) was no longer employed by MBM. That information was incorrect, as Harding was still employed by MBM at that time. The evidence showed that during the

and Apfelbaum met in Slaydek's office and discussed, among other things, the pending construction projects in Essex County. Harding told the group that it was Burke's desire that Harding handle the scheduling and that he (Harding) would receive a commission if PCM obtained the construction management contracts.[9] Shortly after that meeting, Shields, Harding and Campana met with Burke and Gaudet at a restaurant in Essex County. Shields explained to them the services that PCM and Slaydek had to offer in the management of construction projects. Burke stated that he wanted Harding to do the scheduling of the projects. Shields told Burke that because of his noncompetition agreement with MBM, he would have to remain in the background once the contracts had been awarded and that Harding would be the "up-front" person.[10]

Shortly after their meeting with Burke and Gaudet, Shields, Harding, and Campana met at Campana's home. Harding told them that the construction management contracts for the Essex County projects were going to come through and that Burke had requested contributions for his campaign for county commissioner.[11] Because no one present was financially able to make any such contribution, they decided to ask Slaydek for advances on their anticipated commissions. It was further

period in question, Harding was playing a deep game indeed. While he was attempting to obtain the construction management contracts for PCM he was still employed by MBM, a competitor of PCM. In fact, he charged MBM for expenses that he incurred entertaining Burke and Gaudet while he mounted his successful campaign to obtain contracts for PCM.

[9] PCM and Slaydek agreed that the construction management contracts to be awarded by the county commissioners would be in PCM's name and that firm would, in turn, subcontract the work to Slaydek. It was also agreed that Slaydek would receive sixty percent of all monies awarded to PCM by Essex County under the construction management contracts.

[10] PCM and Slaydek agreed by letter dated November 19, 1973, that Harding would "be employed by Slaydek for a stated period and at a fixed salary to accomplish two very important points: (1) . . . Harding will be the primary liaison between [PCM] and the Essex County commissioners, (2) . . . Harding will be responsible for all [PCM] work (scheduling) on all facilities . . . ."

[11] Burke had been reelected county commissioner in 1972. His next campaign for that post was to be in 1976.

agreed that any contribution to Burke would be made through Harding. Subsequently, Shields, Harding, and Campana met with Apfelbaum at Slaydek. They requested advances on their commissions from that company. Within a few days, the same individuals again met and were informed by Apfelbaum that Slaydek was willing to make them advances. The manner in which the campaign contributions were to be made was not discussed at that time. In a subsequent conversation that Shields had with Harding, it was agreed that Shields and Campana would give the money to Harding, who, in turn, would then issue checks to the Burke campaign fund.

On November 19, 1973, Slaydek advanced the sum of $22,500 to PCM. Shields received a check for $10,000 on that date. Campana received a check for $12,500 on December 20, 1973. On the same day that he received the check, Shields deposited the money in his own account and wrote a check for $4,000 to Harding so that Harding could make the contribution to Burke's campaign fund.[12] On November 20, 1973, Harding deposited the Shields check in his own account. On the same day, he made out a check to Gaudet in the amount of $1,000, which was endorsed and cashed by Gaudet. On November 26, 1973, Harding wrote out a check to the "Daniel J. Burke Committee" in the amount of $2,000. Barbara Gaudet, the defendant's wife and the treasurer of the Burke campaign committee, deposited the check in the committee's account on November 27, 1973. On February 9, 1974, Shields wrote a check to Harding in the amount of $2,000. Harding, in turn, wrote a check in that amount on February 15, 1974, to Gaudet, who endorsed and cashed it.

When Campana received the $12,500 check from Slaydek he made out a check for $5,000 to Harding, who deposited the check in his own account. On December 24, 1973, Harding

---

[12] The judge took judicial notice of several sections of G. L. c. 55, pertaining to campaign contributions. The judge, in his charge, instructed the jury that the defendants were not charged with violating any of the various sections of G. L. c. 55 but that the jury could consider the statutes as part of the evidence. The defendants have not raised any issue in regard to this point on appeal.

wrote out two checks to "Cash". One check for $3,000 was deposited in the Burke campaign account on December 28, 1973; the other check for $1,000 was endorsed by Gaudet and apparently cashed by him on January 5, 1974.[13]

At the time that Slaydek agreed to advance the money to PCM, Shields and Campana agreed that the money would be repaid to Slaydek out of proceeds from the Essex County construction management contract. In addition, they both signed promissory notes personally guaranteeing payment of the $22,500 to Slaydek. Despite the letter and the notes, Slayton, one of the principals in Slaydek, became apprehensive at the delay in the awarding of the contract to PCM. He communicated his feelings to Shields who, through Harding, obtained a letter from Burke. The letter was dated January 29, 1974, addressed to Shields as vice president of PCM, and was on the official stationery of the Essex County commissioners. It was signed "Dan". The purpose of the letter was to "reaffirm the selection of your company, [PCM], as the construction managers of the various Essex County projects." The letter also stated that PCM would be appointed by "executive order" at an open meeting on or before March 1, 1974.[14]

Shields was scheduled for an appearance before the Essex County commissioners on February 5, 1974. Prior to that date, sums of money had been given by PCM through Harding, to Gaudet and the Burke campaign committee. Shields had been told by both Harding and Burke that Burke controlled the situation in Essex County. In addition, Shields had received a personal guarantee from Harding and an indication from Burke that PCM would be awarded the construction management contracts.

---

[13] There was no explanation given at trial for the obvious discrepancy between the amount of money given to Shields and Campana to give to Harding for contributions to Burke's campaign fund and the total amounts of money actually received by that fund and by Gaudet.

[14] There was evidence that an "executive order" was never used in the award of contracts by Essex County commissioners. Any type of policy decision needed at least two of the three commissioners' votes to pass; one commissioner did not have the authority to make contracts for the county.

Burke and the other commissioners (Edward Cahill and Katherine Donovan) were present at the February 5, 1974, meeting. It became immediately apparent to Shields that neither Cahill nor Donovan had ever heard of PCM or its principals. Once Shields heard the detailed questioning by Cahill, he realized that PCM did not have any guarantee of obtaining construction management contracts for the contemplated projects. After Shields' presentation, Burke moved to appoint PCM as construction manager for the Salem and Peabody District courthouses and the proposed jail complex. The motion was passed unanimously, subject to the approval by the architect, the State Bureau of Building Construction (BBC), negotiations as to fee, and final approval by the commissioners.

Although Cahill voted to appoint PCM, he stated that he wanted confirmation from the BBC, in writing, that there would be no conflict between the BBC and a construction management firm. As a result of Cahill's concern, one Poulos, the chief examining engineer for the BBC, wrote a letter to Cahill in which he recommended that the county not enter into a contract with a management consultant firm because of duplication of its service with those of BBC. Cahill never saw that letter. As a result of a conversation with someone in Essex County, Poulos wrote a second letter on May 1, 1974. The letter, addressed to Burke, contained statements of Poulos that showed that he had changed his opinion in regard to the hiring of a construction management firm by the commissioners. It stated that the use of construction management firms could be "quite worthwhile" and "may have some merit," particularly in Essex County, and that the BBC "does not feel that the employment of a [c]onstruction [m]anagement [t]eam would be in conflict with the [BBC], and we are willing to cooperate and work in concert with any group selected." After Burke received the letter from Poulos, he showed it to Cahill and said that "[the letter] apparently removes your last objection to the awarding of this contract." Burke informed Cahill that he would bring up the awarding of the construction management contracts again soon. Within a matter of days at a meeting of the county commissioners, Burke moved to appoint PCM to manage the

construction of the district courthouses. The commissioners unanimoulsy voted to pass the motion.[15] On June 4, 1974, a contract was executed between the county commissioners and PCM.

During the subsequent investigation of State and county construction contracts by the Ward Commission in 1979 and 1980,[16] Burke was questioned about the construction management contracts awarded to PCM.[17] He admitted knowing Hard-

[15] Because of an objection by the attorney for the commissioners that PCM was not incoprorated in Massachusetts at the time that the contract was executed, the commissioners voted on January 28, 1975, to rescind their prior vote and then voted unanimously once again to appoint PCM.

[16] In 1978, the Legislature created a special commission to investigate and study the existence and extent of corrupt practices related to the construction of State and county buildings. Resolves 1978, c. 5, superseded in effect by Res. 1979, c. 11. See Ward v. Peabody, 380 Mass. 805, 807 (1980); Ward v. Coletti, 383 Mass. 99 (1981). The commission became known as the "Ward Commission," after the name of its chairman. Among other things, the commission was specifically directed to investigate and study the events concerning the contract between MBM and the Commonwealth relating to the management of construction at University of Massachusetts at Columbia Point. Id.

[17] Some of the questions addressed to Burke by the Ward Commission and his answers are as follows:

> "Q.  Or did you enter into with Harding or Shields, William Harding or Daniel Shields, an agreement whereby if in fact they were awarded, they meaning the firm, PCM, were awarded a contract in Essex County dealing with the renovation or building of courthouses, that you would expect to receive a substantial campaign contribution?
>
> A.  That I just hoped they would do their best during the campaign.
>
> Q.  Did you enter into an agreement where you expected — there was an agreement that they would in fact contribute a substantial amount of money if in fact they received a contract from you?
>
> A.  The only people talking about a substantial or any contributions at all were Mr. Shields or Mr. Harding. My response to them was I am doing the best I can. If it works out, you guys do what you think you should do, that is all.

MR. WARD: Mr. Burke, if you had a conversation with somebody and you said there will be a contribution which is a percentage of a fee, are you saying to me that you can't remember whether that conversation took place?

THE WITNESS: I am saying I don't remember a conversation like that taking place, which to my mind means I can't conceive of my

ing, Shields, and Campana. He stated that he first met Harding and Shields in 1970. He knew Shields to be the coowner of PCM, and he asociated Harding with that company. He was asked a series of questions about conversations that he may have had with Shields or Harding about campaign contributions. He testified before the commission that in regard to campaign contributions, he told Shields or Harding, "I am doing the best I can. If it works out, you guys [Shields and Harding] do what you think you should do." The testimony was admitted only as to Burke, and the judge so informed the jury. We now turn to a discussion of the principal issues raised by either one or both defendants.

1. *The use of testimony of a hypnotized witness.* (Burke, Gaudet.) During the course of its investigation of MBM and its affairs, investigators for the Ward Commission in 1979 questioned Shields, who had last worked for that company in 1973. He was cooperative with the investigators but, because of the passage of time, had difficulty recalling all the events concerning MBM and its dealing with certain political figures in regard to its obtaining construction management contracts. On serveral occasions he was placed under hypnosis and questioned, not only about MBM, but also about PCM. Burke and Gaudet moved to suppress Shields' entire testimony because he had been hypnotized. A judge held a hearing on the motion and received evidence from several witnesses. He denied the defendants' motions to suppress and filed a memorandum of decision that contained findings of fact and reasons for his conclusion.

A brief discussion of the law as it relates to the testimony of a hypnotized witness is appropriate. The Supreme Judicial Court first considered the use at trial of the testimony of a hypnotized witness in *Commonwealth* v. *A Juvenile*, 381 Mass. 727 (1980). The court discussed the use of such tes-

saying that a contribution has to be a percentage of a fee for a lot of reasons. It doesn't sound right. I am not dismissing the fact that Mr. Harding or Mr. Shields might have said something that you do realize our contribution, the way we can help you, is dependent upon the fee you can get; and I just said, do the best you can. I am not saying that didn't happen . . . ."

timony but declined, however, to take an authoritative position because of the absence of findings by the trial judge on several critical points. *Id.* at 729. On March 23, 1983, the court held for the first time, in *Commonwealth* v. *Kater*, 388 Mass. 519, 520 (1983), that "testimony by a witness as to a fact that became available following hypnosis is generally inadmissible in the trial of criminal cases. . . ." Although the court barred the admission of hypnotically based testimony, it also held that "a witness may testify based on what he knew before hypnosis." *Id.* at 521. The court held, however, that before testimony is admitted based on a witness' prehypnotic memory, certain procedural safeguards in regard to the conduct of the hypnosis sessions must be followed.[18] There is no question that the procedural safeguards were not followed in all respects in this case. The court in *Kater*, however, stated that the safeguards do not apply to the admissibility of testimony concerning a witness's prehypnotic memory where the witness was hypnotized before March 23, 1983, the date of its opinion. *Ibid.* The questioning of Shields under hypnosis took place years before the date of the *Kater* decision. Therefore, the procedural safeguards set out in *Kater* do not apply in regard to the admissibility of Shields' testimony based on his prehypnotic memory.[19] See *Commonwealth* v. *Paszko*, 391 Mass. 164, 189 (1984).

Despite the limited applicability of the *Kater* decision to this case, the Commonwealth still has the burden of showing "the reliability of the testimony of its witness who has been hypnotized." *Commonwealth* v. *Kater, supra* at 524, citing *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 734 (1980). *Commonwealth* v. *Brouillet*, 389 Mass. 605, 608-609 (1983).

---

[18] The safeguards were discussed and enumerated, but not adopted, in *Commonwealth* v. *A Juvenile*, 381 Mass. at 732 n.8.

[19] At the time of his decision on the motion, the judge had the benefit of *Commonwealth* v. *A Juvenile*, 381 Mass. 727 (1980), but not of *Commonwealth* v. *Kater*, 388 Mass. 519 (1983). He found that the hypnotist was "eminently qualified" to conduct the hypnotic sessions. He also ruled that the procedures used "were *not* so suggestive as to destroy the reliability of any subsequent testimony from this witness" (emphasis original). We agree.

Therefore, in respect to this case, the Commonwealth must show that Shields' posthypnotic testimony was uninfluenced by hypnosis or that his testimony was based solely on his prehypnotic memory. See *Commonwealth* v. *Dodge*, 391 Mass. 636, 638 (1984).

The motion judge, in his memorandum of decision, made findings concerning Shields' prehypnotic memory. He found that the first discussion that Shields had with the investigators about PCM and its operations in Essex County was on February 21, 1980. Shields was not under hypnosis at the time of the interview. He told the investigators, in some detail, of PCM's scheme to make payments to Burke's campaign fund in return for receiving construction management contracts.[20] The prehypnotic interview was recorded and preserved.[21] On March 5, 1980, Shields was hypnotized and asked questions about PCM, based on his February 21 interview. Under hypnosis, Shields repeated the information that he had given to the investigators during the prehypnotic interview.[22] He gave additional information concerning Harding's role as a liaison between Shields and

---

[20] The judge's complete finding as to the contents of Shields' interview is as follows:

"[Shields] told how he had met Daniel Burke, an Essex County official, while he and William Harding were working for MBM. After Shields left MBM, Harding continued to look for contracts in Essex County. Shields, Harding and one Jerry Campana organized PCM as a construction management firm to do work in Essex County. PCM would sub-contract the design services to Slaydek, Incorporated, a New York firm. Money was paid by Slaydek to Shields and Campana. They then delivered the money to Harding who, in turn, was to pay Burke if the PCM contracts came through. Such payments were to be classified as campaign contributions. Payments were by checks, and the Commonwealth has copies of these checks. PCM was never paid for any part of the contract because the Essex County Treasuer refused payment."

[21] In *Commonwealth* v. *Kater*, 388 Mass. at 529, 530 n.8, the court stated it is of considerable importance that a record of the hypnotized witness's prehypnotic memory be kept and preserved.

[22] At the motion hearing Shields testified that he was unable to distinguish between what he stated before hypnosis and what he said while under hypnosis. This is understandable, because he repeated, in large measure, the same information that he had related during the prehypnotic session. In any event, because transcripts were kept of the prehypnotic interview and the hypnotic session, the judge could separate the prehypnotic testimony from the hypnotically aided testimony.

Burke. Also, Shields identified Gaudet as a friend of Burke and recalled that Burke "didn't want to deal with MBM." The judge concluded that the hypnotic session added very little information to that previously obtained from Shields.[23]

A review of Shields' testimony at trial shows that it was based, almost entirely, on his prehypnotic memory. Any information contained in his testimony that resulted from the hypnosis was either not in controversy at the trial (Gaudet's friendship with Burke) or corroborated by admissions of Burke before the Ward Commission or by tangible evidence such as cancelled checks. *Commonwealth* v. *Kater*, 388 Mass. at 528 n.6.[24] In sum, we hold that Shields' testimony was "reliable" in the sense that that word was used in *Commonwealth* v. *Kater, supra* at 524, and *Commonwealth* v. *A Juvenile, supra* at 734, concerning the testimony of a witness who has been hypnotized.

The defendants also contend that the admission of Shields' testimony in evidence at the trial violated their rights to confront witnesses as stated in the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution. The defendants claim that they were deprived of any opportunity for meaningful cross-examination because hypnosis has the effect of alterating memory and changing a person's characteristics as a witness. The motion judge found that there was no such alteration of Shields' memory as to deny the defendant their right to confront him as a witness.

It has been recognized that witnesses who have been hypnotized "show increased confidence in the veracity of recollections reported under hypnosis, regardless of their accuracy," *Commonwealth* v. *Kater*, 388 Mass. at 528, and that such an alteration of memory might present a confrontation issue. *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 734 n.11 (1980). However, in the *Kater* decision, 388 Mass. at 528-529, the

---

[23] Dr. Orne, the defendants' expert witness at the motion hearing, admitted that there was very little new information elicited from Shields during the hypnotic sessions.

[24] The defendants argue that Shields' testimony was "hypnotically aided hearsay" that was uncorroborated and, therefore, his testimony should have been excluded. However, there was ample corroborative evidence both that Harding acted in behalf of Burke and of Burke's own participation in the scheme.

court concluded that the fact that a witness had been hypnotized does not, by itself, create a constitutional violation of the right to confront a witness. Here, the record shows that Shields' testimony at trial was, in essence, his present memory of events that he remembered before he was hypnotized. The defendants had in their possession transcripts of Shields' prehypnotic and hypnotic interviews. He was vigorously cross-examined by them as to all the events up to the indictments. They did not complain at trial that the hypnosis of Shields created a barrier that prevented a meaningful cross-examination.[25] We reject the defendant's argument and hold that there was no constitutional violation.

2. *Challenge to grand jury venire.* (Burke, Gaudet.) The defendants claim that the trial judge erred when he denied their motions to dismiss the indictments. Those motions were filed on the ground that the procedures employed in assembling the grand jury venire "resulted in the systematic exclusion and/or [*sic*] substantial under-representation of black and Hispanic persons." On appeal, the defendants cite *Commonwealth* v. *Aponte*, 391 Mass. 494 (1984), as the basis for their contention. In *Aponte*, decided on March 19, 1984, well after the conclusion of the trials here, the court ruled that the Essex County grand jury system systematically excluded Hispanic persons in violation of art. 12 of the Massachusetts Declaration of Rights and held that the indictments of the defendants in *Aponte* were properly dismissed in the trial court. It was further stated that the principle in *Aponte* was "not to have retroactive application . . . [but] will be open on direct appeal only to such defendants who *properly* have raised . . . similar claims by a pretrial motion to dismiss" (emphasis supplied). *Commonwealth* v. *Aponte, supra* at 510 n.23. We rule that an examination of the rather complicated procedural history of the defendants' motions demonstrates that they did not properly raise their claims and, therefore, that the *Aponte* decision does not apply to the judge's actions here.

[25] Trial counsel, possibly for stategic reasons, did not bring to the jury's attention the fact that Shields had been hypnotized or the fact that hypnosis may have had an effect on his testimony.

The *Aponte* defendants, indicted by the same grand jury that indicted these defendants, filed their motions to dismiss shortly after the return of their indictments. On August 31, 1981, the defendants here filed motions requesting that they be allowed to join in and to be heard with the *Aponte* defendants at the hearing on their motions. At that time, the defendants here had not filed their motions to dismiss the indictments. Nonetheless, the motion judge allowed the motions.[26] In September, 1981, the defendants filed the motions to dismiss the indictments that are under scrutiny here. According to the motions, they incorporated two affidavits "filed in support of the motions to dismiss" by the *Aponte* defendants. Attached to the defendants' motions as "exhibits" were the two "affidavits" referred to in the motion. The "affidavits" were neither signed nor dated.

The judge assigned to preside at the trial of the defendants here called a conference of trial counsel once he learned of the motion judge's actions.[27] At the conference, he set aside the motion judge's order and separated these defendants' motions from the *Aponte* defendants' motions. Apparently, no objection was taken to the actions of the trial judge.[28]

---

[26] The motions of the defendants to be allowed to join in and to be heard with the *Aponte* defendants at the hearing on the latter's motions and the motion judge's action on them are not reproduced in the appendices or contained on the dockets of these cases. Our information about them has been obtained from the transcript of a hearing before the trial judge on October 22, 1981, when he denied the defendants' motions to dismiss the indictments.

[27] There is nothing in the appendices or, for that matter, in the briefs of the parties about the conference that the trial judge had with trial counsel. It was held some time before October 22, 1981, and again (see n.26) our information is taken from a transcript of the judge's comments to the attorneys in open court on October 22, the day he disposed of the defendants' motions.

[28] The reason stated by the trial judge for reversing the motion judge's order was that the trial of the defendants was scheduled for October, 1981, and that the motion judge's action would delay the trials indefinitely. The trial judge was correct in his reasoning. The evidentiary hearings involving the *Aponte* defendants' motions spanned eleven days from December, 1981, through June, 1982. The trials of Burke and Gaudet concluded in November, 1981.

On October 22, 1981, the day scheduled for trial, the judge heard counsel in regard to the motions. Counsel relied on their "affidavits" presented with their motions. The judge ruled that, "on the basis of what has been filed", the motions were denied. Under Mass.R.Crim.P. 13 (a) (2), 378 Mass. 871 (1979), a pretrial motion must be accompanied by "an affidavit detailing all facts relied upon in support of the motion and signed by a person with personal knowledge of the factual basis of the motion . . . " See *Commonwealth* v. *Pope*, 392 Mass. 493 497 n.6 (1984). Here, the documents filed with the defendants' motions were not signed and, thus, did not meet the definition of an affidavit as set out in the rule. "The requirement of really adequate affidavits should be strictly enforced as a matter of good judicial administration." *Commonwealth* v. *Benjamin*, 358 Mass. 672, 676 n.5 (1971). Because the claims of the defendants in regard to the composition of the grand jury were not properly raised, we hold that the principle enunciated in *Commonwealth* v. *Aponte, supra*, does not apply here.

3. *Denial of motion for required finding of not guilty.* (Gaudet.) The judge denied Gaudet's motion for a required finding of not guilty.[29] Gaudet contends that the judge erred because the evidence against him was insufficient to establish that he was a member of the conspiracy.

In order to establish that the accused is a member of a conspiracy, the evidence must show that he actively participated therein. *Commonwealth* v. *Beal*, 314 Mass. 210, 222 (1943). *Commonwealth* v. *Gill*, 5 Mass. App. Ct. 337, 348 (1977). *Commonwealth* v. *Shapiro*, 10 Mass. App. Ct. 678, 681-682 (1980). Mere knowledge of an unlawful conspiracy is not enough. *Ibid.* We are of opinion that the evidence was sufficient to permit a rational jury to conclude that Gaudet knew of the

---

[29] Gaudet filed his motion for a required finding of not guilty at the close of the Commonwealth's case, at the close of all the evidence, and, after the jury had returned its verdict against him. The Commonwealth's case did not deteriorate during the presentation of Gaudet's evidence. Therefore, we consider only the evidence introduced during the Commonwealth's case in chief. *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976). *Commonwealth* v. *Griffin*, 19 Mass. App. Ct. 174, 178 n.2 (1985).

existence and objective of the conspiracy and that he partici-
pated in it. *Commonwealth* v. *Nelson*, 370 Mass. 192, 200
(1976). *Commonwealth* v. *Cerveny*, 387 Mass. 280, 287
(1982).

Gaudet was a close personal friend of Burke. He had met
Harding, Shields, and Campana. He had been present at several
of the meetings that Harding or Shields, or both, had with
Burke. While in his position as assistant dog officer for Essex
County, Gaudet, on the stationery of the county commissioners,
wrote a letter to Harding on October 26, 1973, informing him
of his selection to enter into contract negotiations for certain
county construction projects (see n.7). Gaudet signed the letter
as "Construction Director," a position he did not hold, nor had
he been so designated by the county commissioners. He was
not authorized to send the letter.

In addition, there was evidence that Gaudet, while assistant
county dog officer, was the recipient of approximately $7,000
in checks from Harding. Gaudet's endorsement was found on
three checks from Harding; two were made payable to Gaudet
and one to cash. A fourth check was made payable to cash,
for $3,000, and a fifth check for $2,000 was payable to the
Burke committee and so endorsed. There also was evidence
that Gaudet actually cashed one of the checks for himself and
received at least $2,000 which was never deposited in Burke's
campaign fund. Most of the money was received by Gaudet
prior to the other two county commissioners' even hearing
about PCM and before they first considered awarding it con-
struction management contracts on February 5, 1974. Thus,
from this evidence the jury could infer that Gaudet was acting
at least as the authorized agent (bagman) of Burke. See *Com-
monwealth* v. *Dutney*, 4 Mass. App. Ct. 363, 368 (1976);
*Commonwealth* v. *Tobin*, 392 Mass. 604, 612 (1984). We are
aware that "[t]he line that separates mere knowledge of unlaw-
ful conduct and participation in it is 'often vague and uncertain'.
It is within the province of the jury to determine from the
evidence whether a particular defendant had crossed that line."
*Commonwealth* v. *Cerveny*, 387 Mass. 280, 287 (1982), quot-
ing from *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass.

188, 250 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910 (1972), and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). There was ample evidence that Gaudet crossed the line and actively participated in the conspiracy.

4. *Judge's instructions to the jury.* (Burke, Gaudet.) Both defendants challenge, on varying grounds, the judge's instructions to the jury. Burke contends that the judge's charge was not clear and, as a result, that the jurors did not understand the instructions. Gaudet joins in Burke's argument and also claims that the judge erred in not charging that in order to prove a violation of § 3(*b*) the Commonwealth had to show a general criminal intent. As a result, Gaudet contends that he was found guilty under an unconstitutionally vague statute. He also claims that the judge committed error in charging the jury that G. L. c. 268A, § 3(*b*), is a lesser included offense of G. L. c. 268A, § 2(*b*).[30]

The standards used by appellate courts to review a trial judge's instructions have been often stated. "A jury charge must be considered as a whole, not by bits and pieces." *Commonwealth* v. *McInerney*, 373 Mass. 136, 149 (1977), quoting from *Commonwealth* v. *Gibson*, 368 Mass. 518, 527-528 (1975). In examining the judge's instructions we note that the judge told the jurors that each defendant was charged with conspiracy to violate either G. L. c. 268A, § 2(*b*), or § 3(*b*), the latter statute he identified as a lesser included offense of § 2(*b*). After reading the indictments to the jury he summarized the elements of § 2(*b*) and § 3(*b*) and stated that the lesser included offense did not require the element of corrupt intent as did § 2(*b*). He cautioned the jurors that the defendants were not charged with the substantive offenses but rather were charged with conspiracy to commit those offenses. He explained,

_____

[30] At a lobby conference with trial counsel before instructing the jury, the judge stated that he planned to dismiss count two, which charged a conspiracy to violate G. L. c. 268A, § 3(*b*), and instead instruct that each defendant was charged with conspiracy to violate either G. L. c. 268A, § 2(*b*) or § 3(*b*). Gaudet objected to the judge's action. At the same conference the judge dismissed count three as being repetitious of count one.

in detail, the elements of conspiracy, including the requirement that intent on the part of the defendants must be proved by the Commonwealth.

After deliberating for some time the jury asked for further instructions in regard to G. L. c. 268A, § 2(*b*) and § 3*b*). The judge again summarized each section adding a definition of the meaning of corrupt intent. Again, he cautioned the jury that the indictments against each defendant charged conspiracy and not violations of the substantive crimes set forth in § 2(*b*) and § 3(*b*). He again stated that in order to prove a conspiracy the Commonwealth must show that the defendant had the intent to commit an unlawful act.

Taken as a whole, the judge's instructions were clear and correct. The defendants were charged with conspiracy and not with substantive violations of G. L. c. 268A. The elements of conspiracy are "a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose. . . . " *Commonwealth* v. *Dyer*, 243 Mass. 472, 483 (1922), quoting from *Commonwealth* v. *Hunt*, 4 Met. 111, 123-125 (1842). The Commonwealth was not required to prove the elements of the substantive offenses in order to show that the defendants agreed to act in concert to violate G. L. c. 268A. *Commonwealth* v. *Zakas*, 358 Mass. 265, 268-269 (1970). The judge was correct in emphasizing the criminal intent required for conspiracy and describing the elements of § 2(*b*) and § 3(*b*) in more general terms. His instructions as to § 3(*b*) were correct. He gave to the jury a description of the essential elements of that section as they are outlined in *Commonwealth* v. *Dutney*, 4 Mass. App. Ct. 363, 375 (1976). Therefore, Gaudet's contention that he was found guilty of a crime that is unconstitutionally vague, as a result of the judge's instruction, is without merit. See *United States* v. *Brewster*, 506 F.2d 62, 77-78 (D.C. 1974), which held that 18 U.S.C. § 201(g), the Federal counterpart of § 3(*b*) (see *Commonwealth* v. *Dutney, supra* at 376), was not unconstitutionally vague or overbroad.[31]

_____

[31] Burke argues that because the judge's charge was imprecise, it led to a compromise verdict and thus constitutional reversible error. Burke,

There was no error in the judge's description to the jury of
§ 3(*b*) as a lesser included offense of § 2(*b*). The court in
*Commonwealth* v. *Dutney, supra* at 376-377, held that the
substantive offense outlined in § 3(*b*) is a lesser included offense
of § 2(*b*). "We perceive no reason why a defendant may not
be convicted of conspiracy to commit a lesser included offense,
where the evidence permits an inference that the conspiracy
is sufficient to encompass not only the offense charged as the
object of the conspiracy, but also a lesser offense included
within that object." *Commonwealth* v. *Saia*, 18 Mass. App.
Ct. 762, 764 (1984). The evidence presented here supported
an inference that the objects of the conspiracy included viola-
tions of § 2(*b*) and § 3(*b*).

The judge's approach to instructing the jury in regard to the
lesser included offense was not unfair. Gaudet had been charged
in count two of the indictment against him with conspiracy to
violate § 3(*b*). Thus, he was fully apprised of the possibility
of conviction of conspiracy to commit the lesser included of-
fense. Therefore, there was no prejudice to him by the judge's
dismissing count two and charging that crime as a lesser in-
cluded offense.

5. *Conclusion.* The complete record has been examined in
light of the several issues raised by the defendants. We conclude
that the defendants received a fair trial and that reversal of
their convictions is not required.

*Judgments affirmed.*

APPENDIX.

A-1. *Sufficiency of evidence before grand jury.* (Burke, Gaudet.) Burke's
motion to dismiss his indictment on the ground that the grand jury did not
have sufficient evidence to establish probable cause was denied by the

---

however, was found guilty of conspiracy to commit the greater offense;
therefore, there was no "compromise" as to his verdict. Assuming the
verdicts were inconsistent, that would not be a sufficient reason for setting
them aside. *Harris* v. *Rivera*, 454 U.S. 339, 345 (1981).

motion judge. There was no error. In *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163-164 (1982), the court held that "the grand jury must hear sufficient evidence to establish the identity of the accused, . . . and probable cause to arrest him." The evidence presented here was largely hearsay, but that fact does not detract from the sufficiency of the evidence presented to the grand jury. The court has not departed "from the rule that an indictment may be based solely on hearsay." *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450 (1984). Our examination of the record leads to the conclusion that sufficient evidence was presented to the grand jury, both to identify Burke and to establish probable cause.

A-2. *Abuse of grand jury procedure.* (Gaudet.) Gaudet filed a motion to dismiss his indictment on the ground that it was a product of abuse of the grand jury proccess by the prosecutor. Gaudet claimed that the prosecutor deliberately called Mrs. Gaudet as a witness before the grand jury, knowing that she would assert the spousal and self-incrimination privileges. The motion was denied.

Mrs. Gaudet was treasurer of Burke's campaign committee during the time outlined in the indictments. There was evidence before the grand jury that she had endorsed and deposited checks in the committee's bank account and that the source of the checks was Harding. She was summoned to appear before the grand jury and moved to quash the summons. Her motion was denied. She notified the prosecutor that she would invoke the privileges if called to testify as a witness. She appeared before the grand jury, accompanied by counsel. She was informed that her husband was a target of the investigation. She invoked both her Fifth Amendment and spousal privileges in response to four questions and was excused. Putting to one side whether a witness may validly assert the spousal privilege if summoned to appear and testify before a grand jury (see *Commonwealth* v. *Paszko*, 391 Mass. 164, 189 n.29 [1984]), we find no error in the denial of the motion. Mrs. Gaudet obviously was in possession of evidence that was relevant to the grand jury's investigation. There is no evidence from this record that the summoning of Mrs. Gaudet and her subsequent appearance before the grand jury was a deliberate attempt by the prosecution to influence that body in its investigation of her husband. To excuse a witness from appearing before a grand jury merely because of a claim in advance that a privilege will be asserted would permit almost any reluctant witness to avoid appearing before that body.

A-3. *Denial of severance motion.* (Gaudet.) Gaudet's motion to sever his trial from that of Burke was denied by the motion judge. The motion was renewed during the trial when Burke's testimony before the Ward Commission was introduced. It was also renewed just before final arguments. On both occasions it was again denied.

One of the grounds advanced by Gaudet for the allowance of his motion was that he needed to obtain exculpatory testimony from Burke but that Burke would not testify at Gaudet's trial unless there was a severance and

Burke's trial preceded Gaudet's trial. In an affidavit that accompanied the motion, Burke stated that "to the best of [his] knowledge and memory" he never told Gaudet to seek campaign contributions in exchange for potential favors, and was never present when such an arrangement was discussed. We recognize that at times a defendant's need to obtain exculpatory evidence from a codefendant may require severance (see *United States* v. *Echeles*, 352 F.2d 892, 897-899 [7th Cir. 1965]), but that is not the situation here. This issue is controlled by *Commonwealth* v. *Barrett*, 6 Mass. App. Ct. 952 (1978), where the court held, in a like situation, that there was no showing that the testimony would in fact have exculpated the defendant. "The fact that the codefendant is willing to take the stand only at a separate trial does not require a severance, even though the codefendant's denial of participation in the alleged offenses might incidentally tend to cast doubt on the defendant's guilt." *Id.* at 953.

The denial of the renewed motion also was not error. The judge, on several occasions, limited the admission of the evidence to Burke and specifically informed the jury that the evidence should not be applied in any respect to Gaudet. Therefore, there was no error in the several denials of the motions.

A-4. *Admission of January 29, 1974, letter.* (Burke, Gaudet.) Both defendants objected to the admission in evidence of the January 29, 1974, letter addressed to Shields and signed by Burke. Burke argues that the letter was erroneously admitted because it lacked sufficient indicia of reliability to qualify it as a business record. Gaudet does not address the issue in his brief but merely joins in Burke's argument. There was no error. The letter was put in evidence through Shields and admitted as an admission of and as a statement of a coconspirator. It was not admitted as a business record. A reading of Shields' testimony, coupled with the facts contained in the letter itself which would be known only to Burke, demonstrates that the letter was authentic and admissible, at least as an admission of Burke.

A-5. *Late disclosure of exculpatory evidence.* (Burke, Gaudet.) The defendants contend that the prosecution failed to disclose that a prosecution witness could not authenticate the signature of Burke or the January 29, 1974, letter. It came out during the cross-examination of a prosecution witness that she had informed the prosecutor a week before that, in her opinion, the signature on the letter was not Burke's signature. The judge termed the evidence "exculpatory" but stated that the defendants had not been prejudiced by the nondisclosure but had, in fact, benefited from it before the jury. We agree with the judge. There is nothing in this record which permits a conclusion that " 'the delayed receipt of the evidence "affected the outcome of the trial," ' *Commonwealth* v. *Wilson*, [381 Mass. 90, 115 (1980)], quoting from *United States* v. *Agurs*, 427 U.S. 97, 104 (1976), or created a substantial risk of a miscarriage of justice." *Commonwealth* v. *Redding*, 382 Mass. 154, 156 (1980).

A-6 *"Reopening" of the Commonwealth's case.* (Burke, Gaudet.) The defendants contend that the judge erred when he permitted the Commonwealth to "reopen" its case after it had rested. At the conclusion of the eighth day of trial, the prosecutor stated that the Commonwealth rested but requested that the judge take judicial notice of certain statutes and read them to the jury. The judge decided to adjourn for the day without reading the statutes to the jury. The following morning, the defendants moved for required findings of not guilty, and the prosecutor moved to reopen the Commonwealth's case in order that the prosecutor could read excerpts of Burke's testimony before the Ward Commission to the jury. The judge ruled that technically the Commonwealth had not rested, as the judge still had to comply with its request to take judicial notice of certain statutes and read them to the jury. He permitted the prosecutor to read portions of Burke's testimony to the jury. We agree with the judge that the Commonwealth had not fully rested. In any event, a judge may permit "the prosecution to reopen its case before the defendant begins its defense . . .". *United States* v. *Hinderman*, 625 F.2d 994, 996 (10th Cir. 1980), quoted in *Commonwealth* v. *Cote*, 15 Mass. App. Ct. 229, 241 (1983). There was no error.

A-7. *The prosecutor's closing argument.* (Burke, Gaudet.) The defendants claim that the prosecutor, in his closing argument committed prejudicial errors that require reversal of their convictions. His reference to Gaudet as a "bagman" was not error, as it was "reasonably descriptive and no more prejudicial than the evidence on which the [characterization was] based." *Commonwealth* v. *MacDonald*, 368 Mass. 395, 402 (1975). In regard to the other claimed errors, the judge's carefully crafted instructions in regard to the closing arguments of counsel were exemplary and undoubtedly cured any impropriety that may have been contained in the prosecutor's argument to the jury. If there was error, it was cured by the judge.