**SCHMALHAUSEN SIEBERT CHEVRO-LET OLDSMOBILE, INC., Kevin Siebert, and A.W. Schmalhausen, Appellants (Defendants Below),**

v.

**Glenn BASS III and Pamela Bass, Appellees (Plaintiffs Below).**

No. 03A01–8912–CV–491.

Court of Appeals of Indiana,
First District.

June 11, 1990.

A. Vance McQueen, Shelbyville, for appellants.

James M. Robison, R. Kent Apsley, Shelbyville, for appellees.

ROBERTSON, Judge.

The defendants-appellants Schmalhausen Siebert Chevrolet Oldsmobile, Inc., an automobile dealership, and its sole shareholders, Kevin Siebert and A.W. Schmalhausen, appeal from a judgment rendered on a jury verdict which awarded the plaintiff-appellee Glenn Bass III and his wife Pamela Bass actual damages of $4,165.95 and punitive damages of $40,000.00.

We affirm.

A statement of the facts favorable to the judgment shows that on Tuesday, July 28, 1987, the Basses attended the Shelby County Fair and, while there, inspected a blue Chevrolet Astro van at the Schmalhausen Siebert dealership tent. They discussed the price of the vehicle with Rex Schmidt, a salesman for the dealership, and Schmidt showed them the features of the blue Astro van and another red Astro van.

The Basses had been looking for a mini van. The blue Astro van had been used during the Indianapolis 500 Mile Race by a race car driver and had mileage of approximately 2,000 miles when the Basses inspected it at the fairgrounds. The sticker price on the blue Astro van showed the cost of the van at $14,162.00, freight of $465.00 and conversion package of $4,469.00 for a total list price of $19,096.00. The sticker also displayed a "Month of May Special" price of $16,587.00. When Mr. Bass stated that he thought the price was too high for the blue Astro van, Rex Schmidt responded that he would have to check at the dealership and get a price.

The following day, the Basses went to the dealership looking for Rex Schmidt and a price for the Astro van. Schmidt was not there, but the general manager, Larry Holler, discussed the van with Mr. Bass. He informed Bass that he would sell the van for $100.00 over cost in order to move it and gave Bass a price of $13,433.00 after referring to a card. Bass asked Holler to write the figure on paper, which he did on the back of Rex Schmidt's business card. The Astro van was not located at the dealership on Wednesday when Holler quoted the price to Bass; it was still at the fairgrounds.

On the next evening, Thursday, the Basses met Schmidt at the dealership. Schmidt told the Basses that he had heard they had been given a price. He asked if they had that price in writing. He checked the price, written on the back of his business card, and returned the card to Mr. Bass. The Basses discussed having the vehicle undercoated and asked Schmidt to give them a total price. Schmidt figured the cost of rustproofing and taxes, and gave the Basses a total price of $14,470.05. The Basses also made arrangements to come back the next day to drive the van.

On Friday, the Basses returned to the dealership and test-drove the vehicle. They made arrangements to close the purchase

of the van the next morning which was Saturday.

On Saturday morning the Basses went to the dealership, signed the sales agreement, went through the warranty information with Schmidt, tendered a check in the amount of $14,500.00, received $30.00 in change and left the dealership with the van. The Basses were told at that time that, "the van is yours." Before going to the dealership the Basses had gone to their bank to sign a promissory note for the purchase price. They also went to their insurance agent to arrange insurance coverage for the vehicle.

The Basses spent half the day Sunday working on their new van. On the following Monday, August 3, 1987, Mr. Bass returned to the dealership to have an interior light fixed. At that time Rex Schmidt asked Bass to follow him inside the dealership where they met with Larry Holler and Larry Fisher. At this meeting Holler told Bass that a mistake had been made on the pricing of the vehicle. He showed him some papers and told Bass that they wanted the van back that night. Bass said the the van was his and that he had even insured the vehicle. Holler told Bass that he would have to come up with an additional $3,000.00. Bass was told that he would be taken home, but the van was coming back to the dealership; that the van would be kept for two (2) days and unless the Basses came up with the money in that time it would be put back out for sale. As Bass was leaving the dealership a check was shoved into his hand by Larry Fisher, who told him "here is your money back, you bring us the rest and the van is yours." The check which Bass was given was drawn on the dealership's account and was not the original certified check which the Basses had used to buy the van. The Basses' certified check had been cashed by the dealership. Rex Schmidt accompanied the Basses home. When they arrived Schmidt asked the Basses if they would want to trade in their red Concord on the deal. As Schmidt was throwing the Basses' personal belongings out of the van into their driveway, Mrs. Bass went into the house to call their attorney. They left im-

mediately for their attorney's office as Schmidt left with the van. When they did not get their van back, the Basses cashed the check which had been forced upon them and paid off their loan including accumulated interest. The dealership sold the Astro van in November 1987 for the sum of $18,636.00.

The window sticker on the van listed a conversion package at $4,469.00. The billing from the conversion company showed a cost of $3,000.00 for the conversion package. The defendants' stock card listed the conversion cost as $4,499.00.

After this lawsuit was filed, the corporation sold the dealership assets. Subsequent to the sale of assets, the corporation was dissolved. The dealership and shareholders were aware of this lawsuit at the time of the sale of assets and later dissolution. At the time of dissolution the corporation had accounts receivable of $24,000.00. At the time of dissolution the corporation had assets which were placed in a liquidating account under the control of the shareholders. The dealership refused, notwithstanding a Motion to Compel, to disclose whether or not it had transferred any assets after the filing of the lawsuit. It also refused to describe assets transferred, to disclose to whom they were transferred, or to disclose the value of any transferred assets.

The issues raised are stated as:

1. Whether Glenn Bass and Pamela Bass (hereinafter "Bass") and Schmalhausen Siebert Chevrolet Oldsmobile, Inc. (hereinafter "dealership") reached an accord and satisfaction with regard to the agreement between them.

2. If there was a breach of the agreement by the dealership, did the conduct of the dealership's employees give rise to punitive damages and was the punitive damage instruction defective.

3. If the conduct of the dealership's employees did give rise to punitive damages was the award of punitive damages in the amount of $40,000.00 excessive.

4. Should the defendants, Kevin Siebert and A.W. Schmalhausen, (hereinafter

"shareholders") have been held personally liable for damages awarded against the dealership, which was a corporation that underwent dissolution after the claimed breach of agreement by the dealership; was it error to deny their motion for directed verdict; and was the instruction on this subject defective.

## I.

The dealership and the shareholders raised the defense of accord and satisfaction, presented evidence in support of that defense, and the jury was properly instructed on accord and satisfaction. The facts relied upon to support the contention that an accord and satisfaction had occurred are directed to the conduct of the parties once the dealership realized it had made a mistake in quoting a price to the Basses. It is argued that subsequent offers made to Bass and his cashing the check given him by the dealership successfully constitutes the necessary elements of accord and satisfaction.

■ The party pleading the defense of accord and satisfaction has the burden of proving it. Upon receiving an adverse negative judgment on the defense it must be shown that the evidence was without conflict and that such evidence could only reasonably lead to one conclusion contrary to the one reached by the trier of fact. *Shelby Federal Sav. and Loan Ass'n v. Doss* (1982), Ind.App., 431 N.E.2d 493, 498. The question of whether an accord and satisfaction has been reached is ordinarily a question of fact for the trier of fact, except when the controlling facts are undisputed and clear. *Tabani v. Hester* (1977), 174 Ind.App. 56, 366 N.E.2d 193. Also, if the intent of the parties relating to accord and satisfaction is ambiguous or in dispute the question is to be presented to the trier of fact. *Id.*

■ We are of the opinion that the intent of the parties was in dispute. The thrust of Bass's testimony was that he did not agree with, or accept, a new contract but that he was in a financial situation not to his liking and, as a result, was forced to cash the check to mitigate his losses. We see no error in the jury accepting that version of the facts and rejecting the accord and satisfaction defense. Stated differently, the evidence was conflicting on this issue which means that the dealership and the shareholders are not entitled to a reversal. *Shelby Federal, supra.*

## II.

■ This issue challenges the award of punitive damages in two respects: that punitive damages were not proven by clear and convincing evidence and that the instruction given on punitive damages is incorrect.

The recitation of the facts in the dealership's brief is designed to give the picture that once the dealership discovered that it had sold the van for too little money they approached Bass with the proposition of paying the difference or giving the van back. However, the facts as accepted by the jury indicates that Bass negotiated the price of the van over a several-day period and paid for it. The dealership cashed that check and made delivery. The transaction was completed and completed under such circumstances that both parties knew, or should have known, what they were doing. The dealership came back to Bass in an attempt to correct a mistake of its own making. The manner in which it undertook to cure its mistake resulted in Basses' being pressured to return the van. The Basses, fearful of arrest for theft or some other criminal charge, and having extended themselves to the limit financially, were placed in a very difficult position which allowed the dealership to prevail. The jury was justified in determining that the dealership's conduct in curing the mistake they had made was, at the least, heavy-handed.

The jury was instructed that in order for the Basses to prevail on the punitive damages claim the proof must be clear and convincing.

A touchstone of appellate review is that on appeal we will not weigh the evidence or judge the credibility of the witnesses. *Lambert v. Yellowbird, Inc.* (1986), Ind. App., 498 N.E.2d 80. The dealership's ar-

gument on this issue is geared to our overturning the jury verdict as a result of weighing the evidence and judging credibility. This we will not do.

■ Next, the dealership objected to language in the punitive damage instruction, as it pertains to the type of conduct necessary to sustain an action for punitive damages. At two different places in the instruction there was language that the defendant's conduct must be "... maliciously, fraudulently, *willfully or wantonly with conscious disregard for probable damages to the plaintiffs ...*" The dealership contends that the underscored language extends the legal criteria for punitive damages. *See Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135.

Basses contend that the matter has been waived because of the failure to make a specific objection at trial. Without addressing the merits of that argument, we are of the opinion that the instruction was appropriate as worded. In order to determine if an instruction misleads the jury, we must examine the evidence and the record to determine if the verdict, under proper instructions, would have been different. *Pardue v. Seven–Up Bottling Co. of Indiana* (1980), Ind.App., 407 N.E.2d 1154. Our examination shows that the instruction did not mislead the jury and the verdict would not have been different if the instruction had been changed in the manner suggested by the dealership.

### III.

The dealership's argument on punitive damages being excessive is founded upon its position that no independent tort was established. Our discussion and decision on the prior two issues dispel that premise as well as negate speculation that the jury considered something other than objective standards in arriving at that figure. This issue presents no error.

### IV.

■ The final issue concerns the denial of a motion for judgment on the evidence submitted on behalf of the two shareholders.

The standard which governs our review of an appeal from a judgment on the evidence is that a trial court may properly grant a defendant's motion for judgment on the evidence only when there is no evidence on one or more critical issues or the evidence with respect thereto is without conflict and leads only to inferences in favor of the defendant. Thus, when there is a complete failure of proof on an essential element of the plaintiff's case, the trial court is correct in taking the case from the jury.... [t]he trial court may consider only the evidence and reasonable inferences therefrom most favorable to the nonmoving party,.... In reviewing the trial court's ruling on a motion for judgment on the evidence, we are bound by the same standards which govern the trial court's decision in the first instance. (Citations omitted.)

*Welch v. Railroad Crossing, Inc.* (1986), Ind.App., 488 N.E.2d 383, 387.

The legal basis for the motion for judgment on the evidence is founded upon IND. CODE 23–1–45–7(d) which allows enforcement of a claim against a dissolved corporation to the extent of its undistributed assets or against a shareholder's pro rata share of the claim if the assets have been distributed in liquidation. The shareholders contend that there was no evidence that the two shareholder-defendants received a distribution of the corporate assets.

There was evidence that corporate assets had been placed in a liquidating account. It would appear to us, as it apparently did to the trial judge, that sum would be undistributed corporate assets specified in the statute. Consequently, there is evidence which would thwart the application of the statute and the motion for a judgment on the evidence.

■ The shareholders also objected to an instruction given by the trial court which set forth the law as it relates to dissolved corporations and collecting upon claims against that corporation. The language tracks the contents of I.C. 23–1–45–7(d). The essence of the objection is that the

second paragraph is inconsistent with the evidence. That paragraph reads:

If a corporation is dissolved after a claim has been made against the corporation, a judgment creditor may enforce his judgment against the corporate assets after such assets have been distributed to the shareholders of the corporation, and such shareholders may be liable to the judgment creditor to the extent of the dollar value of the assets distributed to such shareholders after the dissolution.

There seems to be no significant contention that the instruction is an incorrect statement of the law. It is argued that there is no evidence that the two shareholders had ever received any assets or distribution from the corporation.

There was evidence that after the sale of the dealership and dissolution of the corporation there were assets remaining, apparently accounts receivable for the most part, which were placed in a liquidation account. The instruction, as well as I.C. 23–1–45–7(d), provides alternative means for reaching the assets of a dissolved corporation. The evidence is clear that there were available assets which could serve to satisfy a judgment. We can only conclude that there existed a sufficient evidentiary basis for the giving of the instruction.

Judgment affirmed.

RATLIFF, C.J., and MILLER, J., concur.