## COMMONWEALTH *VS.* CHARLES FRYAR, JR.

Hampden. February 4, 1997. - June 13, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Grand Jury. Jury and Jurors. Constitutional Law,* Jury, Grand jury, Equal protection of laws, Self-incrimination. *Practice, Criminal,* Instructions to jury, Presumptions and burden of proof, Admissions and confessions, Comment by prosecutor. *Malice. Homicide. Evidence,* Hearsay, Expert opinion, Opinion, Prior consistent statement.

A criminal defendant failed to demonstrate minority underrepresentation on the grand jury that indicted him and the trial judge correctly ruled that the defendant's rights under art. 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution were not violated. [240-242]

A criminal defendant's claim of violation of his rights under art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution by reason of the asserted underrepresentation of distinctive community groups, based on visual observation and surname analysis, was correctly denied where the evidence presented did not support a conclusion that any minority underrepresentation was substantial or due to systematic exclusion. [242-244]

At a murder trial, the judge's instructions as a whole adequately explained the Commonwealth's burden of proof of malice aforethought and any alleged errors in the instructions with respect to the difference between murder and manslaughter, or the use of "frame of mind" or "grievous bodily harm" language, did not, in the circumstances, amount to reversible error. [245-248]

At a murder trial, the judge's instructions correctly placed the burden of proof beyond a reasonable doubt squarely on the Commonwealth. [248]

In the circumstances of the evidence at a murder trial, an instruction on involuntary manslaughter was not required. [248-249]

At a criminal trial the judge properly gave a limiting instruction on certain out-of-court statements admitted for impeachment purposes and not as substantive evidence [249-250] and correctly denied the defendant's motion to suppress his voluntary confession [250].

At a criminal trial, the prosecutor's closing remarks about the defendant's demeanor during booking were permissible given the evidence and, in light of the judge's instructions, gave rise to no error. [250-251]

Where a witness in a criminal case gave no opinion when asked whether the defendant was guilty of murder there was no error: the jury knew the offense with which the defendant was charged. [251]

At a murder trial the judge correctly ruled that an expert was qualified to

give testimony on the physics of blood spattering and knife wounds. [251]

At the trial of indictments, the judge did not err in admitting a witness's prior consistent statements from a previous trial to refute allegations of recent contrivance. [252]

INDICTMENTS found and returned in the Superior Court Department on May 10, 1989.

Following review by this court, 414 Mass. 732 (1993), the cases were tried before *Richard F. Connon*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Wendy Sibbison* for the defendant.

*Elizabeth Dunphy Farris*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. The defendant was convicted of murder in the second degree and on two indictments charging assault and battery by means of a dangerous weapon.[1] On appeal the defendant claims that (1) the process for selecting the grand and petit jury venire in Hampden County was unconstitutional; (2) the jury instructions regarding malice, the Commonwealth's burden of proof, and the judge's refusal to instruct on involuntary manslaughter were improper; and (3) there were various errors with regard to evidentiary rulings. We granted his application for direct appellate review. We now affirm the convictions.

We begin with a brief statement of the facts, which we shall supplement as relevant to a particular issue. Around 2 A.M. on April 14, 1989, a street fight broke out between a group of black youths and a group of white college students outside a bar in downtown Springfield. The brawl culminated in the stabbing death of a student. No one saw the stabbing. However, witnesses observed the defendant swinging a stick and sparring with the victim. The defendant was taken into custody, confessed to stabbing the victim, and was indicted by a Hampden County grand jury on May 10, 1989. For a more detailed recitation of the facts see *Commonwealth* v. *Fryar*, 414 Mass. 732, 734-735 (1993) (*Fryar I*).

---

[1]The defendant was previously convicted of murder in the first degree and on two indictments charging assault and battery, but we reversed the convictions. *Commonwealth* v. *Fryar*, 414 Mass. 732 (1993) (*Fryar I*).

1. *Grand and petit jury venires.* The judge conducted an evidentiary hearing on the defendant's challenge to the jury venire selection process and found the following facts.

The procedures used for selecting the grand and petit jury venires were comparable. Each municipality in Hampden County conducted an annual census by mailing a postcard census form to every known residence.[2] The recipient was responsible for returning the census form. The local board of registrars (registrars) used the census results, supplemented by recent additions to the voter registration records, to compile "street lists" with the names of eligible jurors.

The street lists were not completely accurate because some residents failed to respond. Holyoke and Springfield, communities with the highest minority concentration in Hampden County, experienced the highest nonresponse rate. The registrars compiled a list of residences from which no response had been received. Members of the local police force were sent to these residences to gather census information.

The street lists were then transmitted to the office of the jury commissioner (Commissioner). In creating the jury venires the Commissioner calculates the ratio of the population of a given municipality to the population in the judicial district. See G. L. c. 234A, §§ 10-16. This calculation is used in determining potential jurors to be drawn from the municipality. The Commissioner randomly selects that number of prospective jurors from each municipality's street list and sends a jury summons to the address listed on the street list.

According to a 1990 census, Blacks and Hispanics accounted for 15.4% of the eligible jurors in Hampden County. The defendant claims, based on visual observation and surnames from the jury lists, that Blacks and Hispanics represented 7.3% of the petit jury venire. No information was available on the racial composition of the grand jury venires.[3]

The judge found that "the jury selection process currently used in Hampden County is free from discrimination against any group, including African Americans and Hispanics. Fur-

---

[2]The procedures for compiling jury lists and drawing jurors from the lists to serve on grand and petit juries are set forth in G. L. c. 51, § 4, and G. L. c. 234, §§ 4-31.

[3]The judge ruled an analysis of jurors' surnames would be unreliable as an indication of race and denied the defendant's request to contact the jurors to ascertain their race.

ther, both Blacks and Hispanics are represented on juries within constitutionally acceptable parameters." He explained "[t]here is an attempt to generate as accurate a census as possible, including follow-up visits to those residences which do not respond. There is also an attempt to redeliver mail which is undeliverable. Admittedly, and unfortunately, the system is not perfect. . . . There may be a number of factors, many of which may be societal, which render police officers a less than optimum choice to do the census follow-up. . . . Any underrepresentation of minority groups is neither intended nor does it rise to the level of constitutional violation. It is not a product of the jury selection system itself."

The defendant claims that Black and Hispanic citizens were systematically marginalized in Hampden County grand and petit juries. According to the defendant, the underrepresentation is systematic because the two urban areas with the highest concentration of Blacks and Hispanics in the county — Springfield and Holyoke — used ineffective census gathering techniques. He argues that the efforts by police to contact those who failed to respond to census requests were ineffective in minority neighborhoods. As a result, Blacks and Hispanics were underrepresented on the street lists, which in turn caused underrepresentation on the jury venire. Furthermore, the defendant contends that inaccuracies on the street lists caused a higher proportion of undeliverable jury summonses in minority areas. The defendant argues that the grand jury's indictments and the petit jury's convictions violated his rights under art. 12 of the Massachusetts Declaration of Rights and the Fourteenth and the Sixth Amendments to the United States Constitution. We disagree.

In reviewing the judge's ruling that the grand and petit juries were constitutional we must determine whether the evidence supports the judge's factual findings and whether the findings warranted the rulings of law. *Commonwealth* v. *Aponte*, 391 Mass. 494, 504 (1984).

Under art. 12 there is no distinction between the equal protection analysis[4] for grand juries and the Sixth Amend-

---

[4]Under the equal protection analysis, the defendant must first show that the procedure employed to select the grand jury resulted in substantial underrepresentation of his race or of an identifiable group to which he belongs. *Commonwealth* v. *Bastarache*, 382 Mass. 86, 96-97 (1980). "In an equal

ment analysis[5] for petit juries as exists in Federal law. See *Commonwealth* v. *Aponte, supra* at 506; *Commonwealth* v. *Soares*, 377 Mass. 461, 478, cert. denied, 444 U.S. 881 (1979). A criminal defendant is constitutionally entitled to a jury selection process free of systematic discrimination against his grouping in the community. See *Commonwealth* v. *Aponte, supra* at 507; *Commonwealth* v. *Bastarache*, 382 Mass. 86, 101-102 (1980); *Commonwealth* v. *Soares, supra* at 478-479, 481-482. The method of drawing jury lists must produce a fairly numerous and representative body of impartial residents. *Commonwealth* v. *Aponte, supra.* "[T]he ultimate touchstone of constitutionality is whether the system as a whole and in a general sense is or is not calculated to produce as triers a fair cross-section of the populace." *Commonwealth* v. *Peters*, 372 Mass. 319, 322 (1977).

The defendant failed to show minority underrepresentation on the grand jury. The defendant provided no information at all about the racial and ethnic makeup of the grand jury venire when he was indicted. Due to the total lack of evidence regarding the racial composition of the grand jury, the defendant was unable to prove "disproportionate underrepresentation over a significant period of time." *Commonwealth* v. *Bastarache, supra* at 96. Although the defendant may have

---

protection challenge to the selection of a grand jury, a criminal defendant must show that the procedure employed resulted in a substantial underrepresentation of his race or of an identifiable group to which he belongs. *Castaneda* v. *Partida*, 430 U.S. 482, 494 (1977). 'The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.' *Id.* Next, there must be a demonstration of disproportionate underrepresentation over a significant period of time. Finally, if the selection procedure is susceptible of abuse or is not racially neutral, the statistical showing supports the presumption of discrimination. *Id.* On such a showing the burden shifts to the State to rebut the inference of intentional discrimination. *Id.* at 495, 497-498." *Commonwealth* v. *Bastarache, supra* at 96.

[5]Under the Sixth Amendment analysis, the focus is on the exclusion of any distinctive group in the community. *Commonwealth* v. *Bastarache, supra* at 96. In order to make out a prima facie showing that the petit jury was not drawn from a fair cross section of the community, the defendant must show "that (1) the group allegedly discriminated against is a 'distinctive' group in the community, (2) that the group is not fairly and reasonably represented in the venires in relation to its proportion of the community, and (3) that underrepresentation is due to systematic exclusion of the group in the jury selection process." *Id.* at 96-97, citing *Duren* v. *Missouri*, 439 U.S. 357, 364 (1979).

been hampered by the lack of reliable information, he must do more than assert the claim to make out a prima facie case of underrepresentation. See *Commonwealth* v. *Tolentino*, 422 Mass. 515, 520-521 (1996).

The defendant's evidence in regard to petit jury venires was based on visual observation and surname analysis. However, "[t]his court has observed that visual observations alone are not a reliable guide to the true makeup of a jury venire." *Id.* at 520. See *Commonwealth* v. *Colon*, 408 Mass. 419, 438 & n.11 (1990) (rejecting visual assessment of minority representation in jury venires as insufficient to establish statistically significant disparity of representation). Surname analysis seems an equally unreliable indication of racial and ethnic identity. Nevertheless, even if we were to conclude that the defendant's evidence was reliable, the statistics do not show that minority underrepresentation was substantial.

As noted above, Blacks and Hispanics constituted 15.42% of the population of eligible jurors in Hampden County and 7.33% of the venire. A criminal defendant is not constitutionally entitled to a proportionate number of his race on the jury venire. See *Swain* v. *Alabama*, 380 U.S. 202, 208 (1965); *Commonwealth* v. *Aponte*, *supra* at 507. The majority of courts have looked to the absolute disparity test to determine whether underrepresentation of a group is substantial.[6] See *Duren* v. *Missouri*, 439 U.S. 357 (1979); *Castaneda* v. *Partida*,

---

[6]The defense proposes that we employ the "comparative disparity" test to measure minority representation. This test focuses on the percentage difference between the number of Blacks and Hispanics eligible for jury service and the number of Blacks and Hispanics actually called to serve. For Hampden County, the comparative disparity formula shows that Blacks and Hispanics are underrepresented in Hampden County jury pools by 52.46%.

| Blacks | Hispanics | Totals |
|---|---|---|
| 6.91% - 5.55% = 20% | 8.51% - 1.78% = 79% | 15.42% - 7.33% = 52% |
| 6.91 | 8.51 | 15.42 |

Courts have been reluctant to adopt the comparative disparity standard mainly because it can seem to overstate the degree of underrepresentation in the case of a very small minority. *United States* v. *Hafen*, 726 F.2d 21, 24 (1st Cir.), cert. denied, 466 U.S. 962 (1984) ("the smaller the group is, the more the comparative disparity figure distorts the proportional representation"). Relatively few courts use the comparative disparity test. See. Note, A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel, 103 Yale L. J. 1913 (1994). See also *United States* v. *Jackman*, 46 F.3d 1240 (2d Cir. 1995). Even if we were to employ this test,

430 U.S. 482 (1977); *United States* v. *Hafen*, 726 F.2d 21, 24 (1st Cir.), cert. denied, 466 U.S. 962 (1984); *United States* v. *Clifford*, 640 F.2d 150, 155 (8th Cir. 1981); *United States* v. *Armstrong*, 621 F.2d 951, 956 (9th Cir. 1980). In order to calculate the absolute disparity between a group's representation in the population and its representation in the jury venire one simply subtracts the latter percentage from the former. In this case, where Blacks and Hispanics form 15.42% of the eligible jurors in Hampden County and account for only 7.33% of the jury venire, the absolute disparity is 8.09 percentage points. The courts that have adopted the absolute disparity measure have ruled that a less than ten percentage point disparity can never be substantial. See *Swain* v. *Alabama*, *supra* at 208-209 (purposeful racial discrimination not satisfactorily established by showing that identifiable group underrepresented by 10%); *United States* v. *Rodriguez*, 776 F.2d 1509, 1511-1512 (11th Cir. 1985) (holding that absolute disparity that did not exceed 10% insufficient to make out prima facie case); *United States* v. *Tuttle*, 729 F.2d 1325 (11th Cir. 1984), cert. denied, 469 U.S. 1192 (1985) (same); *United States* v. *Clifford*, *supra* at 155 (holding that absolute disparity of 7.2% insufficient because it did not exceed 10% mark); *United States* v. *Maskeny*, 609 F.2d 183, 190 (5th Cir.), cert. denied, 447 U.S. 921 (1980) (absolute disparity must exceed 10% for finding prima facie case). Although the venire contained a smaller proportion of Blacks and Hispanics than found in the community, we conclude that the venire passed the constitutional requirement for minority representation.

Not only did the defendant fail to meet the absolute disparity test, he did not establish that any underrepresentation was due to systematic exclusion. The street lists were compiled by a random process. "There is much to be said for the compilation of jury lists by a random process, one which allows for the exemption of persons defined by statute, but otherwise eliminates the consequences of selections based on subjective considerations." *Commonwealth* v. *Bastarache*, *supra* at 103. The municipal authorities had no discretion over whose names should appear on the lists. See *Commonwealth* v.

a 52% disparity probably does not rise to the level of a constitutional violation under this standard. See *United States* v. *Hafen*, *supra* at 23-24 (54.2% disparity not substantial disparity); *United States* v. *Levasseur*, 704 F. Supp. 1158, 1163 (D. Mass. 1989) (50.3% disparity not substantial disparity).

*Aponte,* 391 Mass. 494, 508 (1984) ("key man system" disfavored because city officials had discretion to pick names); *Commonwealth* v. *Bastarache, supra* at 102-103 (same). Thus, the system for selecting jurors in Hampden County did not present the possibility of abuse by "allowing for the selection of jurors 'based on subjective considerations.' " *Commonwealth* v. *Aponte, supra,* citing *Commonwealth* v. *Bastarache, supra* at 102-103.

"A requirement that each venire be mathematically representative would not only be administratively unfeasible, but would also invite improper manipulation of the panel." *Commonwealth* v. *Soares, supra* at 482. Individuals who fail to respond to the census requests are not included in the lists from which potential jurors are drawn. The evidence indicates that the representation of Blacks and Hispanics in the jury pool was adversely affected because the communities with the highest percentage of Blacks and Hispanics have the highest nonresponse rate. We encourage aggressive attempts to contact those who do not respond to make the juror lists as complete as possible.[7] Ultimately, however, the completeness and accuracy of the juror lists depends in large part on the cooperation of citizens.

When our decisions on jury composition are read together, it is apparent that art. 12 affords a defendant at least as much protection as the Sixth and the Fourteenth Amendment; therefore, there is no need to evaluate the defendant's claim under provisions in the United States Constitution. See *Commonwealth* v. *Tolentino, supra* at 519 n.2; *Smith* v. *Commonwealth,* 420 Mass. 291, 295 & n.6 (1995); *Commonwealth* v. *Aponte, supra* at 506 & n.20; *Commonwealth* v. *Soares, supra* at 476-479 & n.17.

---

[7]General Laws c. 51, § 4, was amended through St. 1993, c. 475, §§ 2A, 3, 58. As of January 1, 1998, municipal authorities will no longer be required to visit or to communicate annually with residents to obtain census information. The office of the jury commissioner has expressed concerns that the jury selection venire will not be as racially inclusive when this law takes effect. We join in this concern. While the annual lists prepared by municipalities under the present status of the law are not totally accurate, the law clearly defines the obligations of the municipalities and provides the guidelines within which improvements could be enforced. See Equal Justice: Eliminating the Barriers, Commission to Study Racial and Ethnic Bias in the Courts 59 (1994). Under the new law, there will no longer be a statutory directive with respect to how the information within the lists must be obtained.

2. *Jury instructions.* The defendant argues that the jury instructions (a) understated the Commonwealth's burden to prove malice, (b) generally misallocated the burden of proof, and (c) erroneously omitted a requested charge of involuntary manslaughter. We shall consider each argument in turn.

a. *Burden of proving malice.* The defendant argues that three errors interacted to understate the Commonwealth's burden of proving malice. First, he claims the judge failed to state clearly, when explaining the malice charge, that the jury could consider the mitigating factors which, he says, reduce murder to manslaughter. Specifically, he argues that the explanation was inadequate because the sole language in the malice charge which referred to manslaughter was, "[a]ny intentional killing of a person without legal justification or excuse, *without any extenuating circumstances sufficient in law to reduce the crime to manslaughter* is malicious within the meaning of malice aforethought" (emphasis added). Second, the judge said that "[m]alice aforethought refers to a *frame of mind* which includes not only anger, hatred, and revenge, but also every unlawful and unjustifiable motive," language which this court disfavors (emphasis added). See *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). Third, the judge incorrectly charged that the third prong of malice requires "a strong and plain likelihood that death or *grievous bodily harm* could result from the contemplated act" (emphasis added). See *Commonwealth* v. *Sires*, 413 Mass. 292, 303-304 n.14 (1992). The defense argues that the combination of these errors was particularly troublesome because we observed in the first appeal that the evidence was "far from overwhelming." *Fryar I, supra* at 743.[8]

[8]In this trial the judge gave the following charge:

"[T]he Commonwealth must prove beyond a reasonable doubt . . . that the killing was committed with malice aforethought. Malice aforethought refers to a frame of mind which includes not only anger, hatred, and revenge, but also every unlawful and unjustifiable motive.

"However, malice aforethought does not necessarily imply ill will towards the person killed. Any intentional killing of a person without legal justification or excuse, without any extenuating circumstances sufficient in law to reduce the crime to manslaughter is malicious within the meaning of malice aforethought. Whether a killing is actually committed with malice aforethought is determined from the nature and quality of the act which attends the killing.

"If the circumstances attending a killing disclose that death flows from a

In determining the propriety of a jury instruction,. "[w]e

purposeful selfish wrongful motive as distinguished from the frailty of human nature, then that would constitute malice aforethought. Malice aforethought includes any unexcused specific intent to kill or an unexcused specific intent to do grievous bodily harm or unexcused intent to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow.

"Malice aforethought may be inferred if the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death or grievous bodily harm would follow the contemplated act. . . .

"You may draw the inference of malice, however, only if the defendant used such force that according to common experience, it was a plain and strong likelihood that death or grievous harm would follow the defendant's act. Bear in mind that you're not allowed to draw this inference of malice if the use of a dangerous weapon was unintentional or accidental.

"The burden of proof is on the Commonwealth to prove beyond a reasonable doubt these elements and beyond a reasonable doubt that it was not unintentional and it was not accidental. With respect to alcohol, you may consider the defendant's mental condition on the day in question, including any impairment caused by the ingestion of alcohol or drugs, if any, in determining the defendant's ability or the capacity to form the specific intent to kill the victim or to form the specific intent to inflict grievous bodily harm on him, both of which are the basis of finding malice aforethought.

"If the Commonwealth has proved beyond a reasonable doubt that the defendant had the specific intent to kill or to grievously injure, the defendant's consumption of alcohol or drugs, if any, does not excuse or justify his actions.

"Now, the Commonwealth must prove what we call the three prongs of malice, where the defendant had a specific intent to kill or where the defendant had a specific intent to cause grievous bodily harm. And the third prong of malice does not require any specific intent.

"It's a general intent that the defendant would have the knowledge that a reasonably prudent person would have to know that the actions that they are committing, there is a strong and plain likelihood that death or grievous bodily harm could result from the contemplated act. You're permitted to consider the use of alcohol with respect to the element of knowledge on that third prong of malice. . . .

"If after your consideration of all the evidence the Commonwealth has not proven beyond a reasonable doubt the elements necessary to prove the defendant guilty of second degree murder, you must then consider whether the Commonwealth has proven a lesser included offense of manslaughter. . . .

"The crime of manslaughter involves certain mitigating circumstances, which I will outline for you. These mitigating circumstances operate to ne-

must consider the instruction in question in the context in which it was delivered, in order that we might determine its probable effect on the jury's understanding of their function." *Commonwealth* v. *Adrey*, 397 Mass. 751, 753-754 (1986). Because we conclude that the instructions as a whole adequately explained the burden of proving malice aforethought, the errors, independently or collectively, do not amount to reversible error.

First, the judge adequately explained the difference between murder and manslaughter. "We do not require that any specific words be spoken in a jury instruction," *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995), and "the law does not require repetition of the same thought at each turn." *Commonwealth* v. *Todd*, 408 Mass. 724, 727 (1990), quoting *Commonwealth* v. *Peters*, 372 Mass. 319, 324 (1977). Here, the judge instructed the jury on the elements of murder and the requirement of malice aforethought. The judge also explained the elements of voluntary manslaughter and indicated that extenuating circumstances can negate the element of malice. These instructions adequately explained that the jury could consider mitigating factors which would result in a finding of manslaughter rather than murder.

Second, the "frame of mind" language did not amount to reversible error. We have indicated that "[t]his language is not helpful . . . because it may lead the jury to believe that anger, hatred, revenge or a selfish wrongful mood is enough to show malice." *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996), quoting *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). When read as a whole, we conclude the charge is not reasonably susceptible to such an interpretation and adequately explained the concept of malice aforethought.

gate the element of malice. Plus, if the mitigating circumstances are present, the law provides, even though a defendant has committed an unlawful killing, the crime is manslaughter and not murder. . . ."

Following this instruction, the defense objected on the basis that the charge (1) omitted the Commonwealth's burden to prove the absence of provocation, heat of passion, and excessive force in self-defense; (2) understated the Commonwealth's burden by stating that malice included "anger, hostility, revenge . . . [and] purposeful selfish motivation"; and (3) included the risk of "grievous bodily harm" language in its definition of third prong malice. In response the judge gave the following instruction:

"[T]he Commonwealth has the burden to prove beyond a reasonable doubt that the defendant used excessive force in defending himself with respect to the voluntary manslaughter charge."

Finally, inclusion of the "grievous bodily harm" language in the third prong of malice was not reversible error. The evidence showed that the victim was stabbed in the chest with a knife. This evidence does not warrant a finding of a risk of harm less than a strong likelihood of death. See *Commonwealth* v. *Morgan*, *supra*. Thus, the erroneous grievous bodily harm language in the third prong instruction was harmless.

b. *Burden of proof.* The defendant contends that the instructions impermissibly shifted the burden of proof to the defendant because the judge told the jurors that it was their job to assess the witnesses' credibility. Because the defendant testified, the defense argues that this instruction created the risk that the jury would think they only had to decide whether the Commonwealth's or the defendant's story was more credible. We disagree.

"In considering whether a charge lowers the criminal standard of proof, we consider the charge, taken as a whole, and assess the possible impact of the alleged error on the deliberations of a reasonable juror, i.e., whether a reasonable juror could have used the instruction incorrectly." *Commonwealth* v. *Rosa*, 422 Mass. 18, 27 (1996), citing *Commonwealth* v. *Torres*, *supra* at 490-491 & n.10. Here, the judge repeatedly stated that the Commonwealth had the burden of proving each element beyond a reasonable doubt and used the time-tested instruction on reasonable doubt language from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). We conclude that the judge placed the burden of proof beyond a reasonable doubt squarely on the Commonwealth.

c. *Instruction on involuntary manslaughter.* Finally, the defendant argues that the judge should have instructed the jury on involuntary manslaughter because the jury could infer that the defendant was using the knife to fend off rather than stab the victim. We disagree.

> "There are two aspects of involuntary manslaughter. *Commonwealth* v. *Sneed*, 413 Mass. 387, 393 n.4 (1992). One aspect involves wanton and reckless conduct causing death. *Id.* The other concerns an unintentional killing resulting from a battery not amounting to a felony which the defendant knew or should have known endangered human life. *Commonwealth* v. *Fitzmeyer*,

414 Mass. 540, 547 (1993). An instruction on involuntary manslaughter is required where any view of the evidence will permit a finding of manslaughter and not murder. *Commonwealth* v. *Sires*, 413 Mass. 292, 301 (1992). When it is obvious, however, that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required. *Commonwealth* v. *Fitzmeyer, supra* at 547."

*Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994). The evidence showed that the defendant had first fought with a stick and then brandished a knife and used it to stab the victim in the chest. An instruction on involuntary manslaughter was not required. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 105 (1997).

3. *Evidentiary rulings.* a. In his confession the defendant told the police that one Tommy Barklow handed him the knife during the fight. After the conviction in the first trial, the defendant claimed that Barklow had bragged to one Jason Franklin that he, not the defendant, stabbed the victim.

Barklow testified at the second trial and denied making such statements. Later, Franklin testified about two incidents where Barklow "declared" that he was the one who had stabbed the victim. After Franklin's testimony, the judge instructed the jury that Barklow's declarations could be considered only for impeachment purposes as a prior inconsistent statement and not as substantive evidence. The defendant claims that the limiting instruction was improper. We disagree.

"An out-of-court statement made by a person that he, and not the defendant on trial, committed the crime is admissible [for substantive purposes] where: (1) the declarant's testimony is unavailable; (2) the statement tends so far to subject the declarant to criminal liability that a reasonable man would not have made the statement unless he believed it were true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its truthfulness." *Commonwealth* v. *Gagnon,* 408 Mass. 185, 193-194 (1990), citing *Commonwealth* v. *Galloway,* 404 Mass. 204, 207-208 (1989). Proposed Mass. R. of Evid. 804 (b) (3). Here, the exception does not apply because the declarant was avail-

able and testified at trial. Furthermore, the judge did not find corroborating circumstances indicating its truthfulness. The judge stated on the record, "There are some serious questions the Court has with respect to the trustworthiness [of this] information, [coming] almost four or five years after the alleged incident." The judge did not err in giving a limiting instruction.

b. The judge denied a motion to suppress the defendant's confession. The defense argues that this statement was inadmissible because it was taken ten hours after the defendant was taken into custody. See *Commonwealth* v. *Rosario*, 422 Mass. 48, 56-57 (1996) (six hour per se "safe harbor" rule). In *Fryar I, supra,* we said in dictum that there was sufficient evidence to support the judge's finding that the statements were voluntary and that the police did not intentionally delay the defendant's arraignment. We see no reason to disturb this conclusion.[9]

c. The defendant contends that the Commonwealth improperly used his demeanor during his booking as testimonial evidence. During closing arguments, the prosecutor commented that the defendant looked "smug" during the booking and stated, "Is this the person who had lashed out at people because he's scared." The defendant argues that the prosecutor's comment was an unconstitutional infringement on his right against self-incrimination. We disagree.

The privilege against self-incrimination only applies to testimonial evidence. *Commonwealth* v. *Hughes*, 380 Mass. 583, 588, cert. denied, 449 U.S. 900 (1980). The privilege does not apply where the subject is merely the source of real, physical, or identification evidence. *Id.* at 588-589. Thus, a booking photograph does not fall within the scope of the privilege against self-incrimination. *Commonwealth* v. *Brennan*, 386 Mass. 772, 778 (1982).

Looking at the prosecutor's remarks in light of the entire argument, the judge's instructions, and the evidence at trial, the prosecutor's argument was not improper. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 425-426 (1991); *Com-*

---

[9]The safe harbor test announced in *Commonwealth* v. *Rosario*, 422 Mass. 48 (1996), does not apply in this case. "The court limited the application of the rule announced in *Rosario* to incidents of presentment delay occurring after our decision in that case was announced." *Commonwealth* v. *Butler*, 423 Mass. 517, 524 (1996).

*monwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984). The defendant testified that he was "scar[ed]" after his arrest. During cross-examination, the prosecutor sought to impeach the witness by showing that he was smiling during the booking procedure. When viewed in this context, the prosecutor's comment about the defendant's smug expression was permissible argument. Furthermore, the judge instructed the jury that the "lawyers are the advocates" and that "opening statements and closing arguments of counsel are not evidence in this case." In light of the evidence and the judge's instructions we conclude that there was no error arising from this statement.

d. On redirect examination the prosecutor elicited from Officer Raymond Muise that murder charges were lodged against the defendant after he confessed. The prosecutor then asked, "Do you make a decision as to whether a charge should be murder or manslaughter?" Over the defendant's objection, the officer answered, "No. That, yes, we make a decision. No. I shouldn't say it like that. The charge is murder." The defendant argues that the judge erred in admitting a police officer's opinion that the defendant was guilty of murder. We do not agree.

The prosecutor should not have sought the opinion of the police officer on whether the defendant was guilty of murder if that is what the question was intended to elicit. However, the witness gave no opinion on the ultimate question of the defendant's guilt and only reiterated the charge. This was not error. See *Commonwealth* v. *Ross*, 339 Mass. 428, 435 (1959). The jury already knew that the defendant was charged with murder.

e. The defense argues that the Commonwealth's chemist was incompetent to give testimony on the physics of blood splattering and the knife's ability to inflict wounds. We do not agree. "A trial judge has broad discretion with respect to the admission of expert testimony." *Commonwealth* v. *Dockham*, 405 Mass. 618, 628 (1989). The witness was the supervising chemist in the criminalistic section of the State police crime laboratory. He had a bachelor's degree in chemistry and had taken courses in blood splatter pattern interpretations at the Federal Bureau of Investigation Academy. We conclude that the judge did not err in ruling that the witness was sufficiently trained to give expert testimony on blood splattering.

f. The defendant argues that the prosecutor improperly rehabilitated a witness with prior consistent statements. On direct examination the witness described the alleged stabber's clothing. On cross-examination the defense impeached the witness with a statement given to police on the night of the incident and prior testimony at the first trial and before the grand jury, thus implying that the witness had changed her testimony since the first trial.[10] On redirect the Commonwealth rehabilitated the witness with consistent testimony from the first trial. The defendant argues that the admission of these statements was error.

Generally, a witness's prior consistent statement is inadmissible. However, a witness's prior statement is admissible where a claim is made that the witness's in-court statement is of recent contrivance or is the product of inducement or bias. See *Commonwealth* v. *Kater*, 409 Mass. 433, 442 (1991); *Commonwealth* v. *Zukoski*, 370 Mass. 23, 26-27 (1976). "The trial judge has a range of discretion in determining whether a suggestion of recent contrivance exists in the circumstances." *Commonwealth* v. *Zukoksi, supra* at 27. See *Commonwealth* v. *Bart B.*, 424 Mass. 911, 917 (1997). We conclude that the judge did not err in allowing the admission of prior consistent statements from the first trial to refute the allegations of recent contrivance.

*Judgments affirmed.*

---

[10]The witness testified about seeing a black male wearing a University of Connecticut shirt and swinging a stick and another black male wearing a black jacket holding a knife. The defendant introduced the witness's statement to police which made no reference to an individual wearing the University of Connecticut shirt.